UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
*electronically filed*

BLACKSTONE ALTERNATIVE ASSET
MANAGEMENT L.P., and KKR & CO. INC.,

                    Plaintiffs,

      v.

DAVID L. HARRIS, KEITH PEERCY,
W. JOE BROTHERS, JOHN E. CHILTON,
RAYMOND CAMPBELL CONNELL, KELLY
DOWNARD, JOHN R. FARRIS,
J.T. FULKERSON, DAVID M. GALLAGHER,
SHERRY LYNN KREMER, MATTHEW
MONTEIRO, BETTY PENDERGRASS, JERRY
WAYNE POWELL, DAVID RICH, and THOMAS
B. STEPHENS,

                    Defendants.

C.A. No. _____

## VERIFIED COMPLAINT

        Plaintiffs Blackstone Alternative Asset Management L.P. ("BAAM") and KKR &

Co. Inc. ("KKR"), by and through their respective undersigned attorneys Paul, Weiss, Rifkind,

Wharton & Garrison LLP and Wyatt, Tarrant & Combs, LLP, for BAAM and Susman Godfrey

L.L.P. and Dinsmore & Shohl LLP, for KKR bring this action against Defendants David L.

Harris, Keith Peercy, W. Joe Brothers, John E. Chilton, Raymond Campbell Connell, Kelly

Downard, John R. Farris, J.T. Fulkerson, David M. Gallagher, Sherry Lynn Kremer, Matthew

Monteiro, Betty Pendergrass, Jerry Wayne Powell, David Rich, and Thomas B. Stephens, to

protect themselves from further violations of their federal due process rights[1] and allege as
follows:

## NATURE OF THE ACTION

1.      This is an action for a judgment declaring that Defendants, current
Trustees of the Kentucky Retirement Systems ("KRS"), have violated BAAM's and KKR's right
to due process by failing to control and supervise private, contingency-fee counsel asserting
claims on KRS's behalf.  The claims are asserted in *Mayberry, et al.* v. *KKR & Co., L.P., et al.*
(the "*Mayberry* Action"), a purported derivative action brought by eight private plaintiffs (the
"*Mayberry* Plaintiffs") who are individual beneficiaries of pension plans administered by KRS.
*See Mayberry* Complaint, Ex. 1.  This action seeks injunctive relief to prevent Defendants from
continuing to violate BAAM's and KKR's rights by failing to impose the proper safeguards or
supervision that the law requires.  Claims on behalf of the State are supposed to be prosecuted in
the best interests of the State, free from personal financial interest, by those accountable to the
public.  The *Mayberry* litigation has been anything but.

2.      The *Mayberry* litigation arises from KRS's decision in 2011, after
experiencing severe losses in the 2000–01 dot-com and 2008–09 financial crises, to invest a
small percentage of its investment portfolio in three funds of hedge funds, one of which was
managed by BAAM and another of which was managed by Prisma Capital Partners, L.P.

---

[1]     In the state-court action that made this federal-court action necessary, KKR, The Blackstone
Group, L.P. ("Blackstone"), and others moved to dismiss all claims against them on the
ground, among others, that the state-court's exercise of personal jurisdiction over these
entities is itself a violation of their due-process rights under the Fourteenth Amendment of
the United States Constitution.  KKR and BAAM bring this action to *preserve* their due-
process rights and do so *without prejudice* to KKR, Blackstone, and others' right to dismissal
of the state-court action for lack of personal jurisdiction.

("Prisma").  The investments were made through the Blackstone Henry Clay Fund, LLC (the "Clay Fund"), a limited liability company formed between KRS and BAAM, and the Daniel Boone Fund LLC (the "Boone Fund"), a limited liability company formed between KRS and Prisma.  More than a year *after* KRS invested in the Boone Fund, Prisma was acquired by KKR's indirectly owned subsidiaries.

3.      The investment with BAAM was the product of a competitive, arms-length bidding process in which KRS sought investment managers that would pursue a conservative, diversified investment strategy to reduce KRS's exposure to the public equity markets following its unprecedented losses in those markets.  And there is no dispute that the Clay Fund did just that.  Indeed, KRS's investment with BAAM was an unqualified success.  Over five years, the Clay Fund generated profits of more than *$158 million net of fees*.  BAAM delivered to KRS an annualized return of 6.5%, thereby exceeding by nearly *three times* the benchmark return set by KRS in its contractual agreement.  KRS decided to wind down the Clay Fund in 2016, for reasons unrelated to BAAM's performance, having reaped substantial profits in addition to the downside market protection for which it bargained.

4.      The *Mayberry* Plaintiffs allege that KRS's investments in the Clay Fund, the Boone Fund, and other funds of hedge funds were "unsuitable" and that KRS did not understand the nature of the Clay Fund and Boone Fund investments or their fee structures.  *Id.* ¶ 248.  They seek up to $50 billion in compensatory damages, as well as an unspecified amount of punitive damages, from BAAM, KKR, and their co-defendants in the *Mayberry* Action in an effort to recoup KRS's *entire* funding deficit on the unprecedented and illogical theory that KRS would be far better funded today had it not been for these investments.  They seek this recovery not for themselves, but for KRS's coffers—even though KRS itself is well aware that those

allegations are completely false and at odds with the clear terms of KRS's own contracts with BAAM and the other fund manager defendants. *Id.* at Prayer for Relief ¶¶ 4–5.

5.      KRS, however, does not control the *Mayberry* litigation. The *Mayberry* Plaintiffs are represented by private counsel working on an undisclosed contingency-fee basis and advised by "pension consultant" Bill Lerach—a disbarred former attorney who was convicted of engaging in an illegal scheme to conceal kickbacks to named plaintiffs in class action lawsuits. While they seek damages only for KRS, and not for themselves, the *Mayberry* Plaintiffs apparently intend to deduct an undisclosed portion of any damages ultimately awarded to KRS in order to compensate their private counsel and consultant.

6.      KRS is trying to have it both ways—to reap the benefit of the *Mayberry* case, without taking on any responsibility for it. But due process does not permit an arm of the state to outsource the prosecution of its claims in this way without any oversight. On the one hand, KRS repeatedly has represented to the Franklin Circuit Court that it believes the *Mayberry* Plaintiffs' claims against BAAM and KKR are meritorious. However, it refuses to assert those claims directly, or exercise control over the claims pursued on its behalf. KRS has not aligned itself as a Plaintiff in the *Mayberry* litigation, nor has it retained the *Mayberry* Plaintiffs' contingency-fee counsel to represent it. Indeed, in a "Joint Notice" filed with *Mayberry* Plaintiffs in Franklin County Circuit Court, in the same breath that KRS declared its "support" for the *Mayberry* claims, it expressly *disclaimed* any intention of controlling or supervising the *Mayberry* Plaintiffs' brazen and unprecedented attempt to secure approximately $50 billion from BAAM, KKR, and other entities in KRS's name. *See* Joint Notice, Ex. 2. Moreover, KRS has retained *separate counsel* in the *Mayberry* Action from the contingency-fee counsel that were retained by the *Mayberry* Plaintiffs.

4

7.     By expressing support for the *Mayberry* Plaintiffs' claims, but refusing to exert any control over the litigation, Defendants have abdicated their responsibility as KRS Trustees.  Litigation on behalf of the State, particularly when seeking punitive damages, must be neutrally prosecuted in the public interest.  When a State entity hires contingency-fee attorneys to prosecute its claims, the self-interest of the hired lawyers—who stand to make a personal fortune if successful—may cloud the good faith assessment of the public interest that an impartial state attorney is required to make.  That policy concern is amplified to a constitutional violation when the State entity lacks ultimate authority and control over the prosecution.  That is precisely what has occurred in the *Mayberry* case, and its prosecution thereby violates BAAM's and KKR's right to due process under the Fourteenth Amendment of the United States Constitution.

8.     In addition, KRS's failure to control the *Mayberry* Plaintiffs' counsel in pursuing derivative claims on behalf of KRS contravenes its requirements under KRS 61.645(2)(a), which provides that the KRS Board has the "powers and privileges of a corporation, including" the power "[t]o sue and be sued in its corporate name."  This statute makes clear that KRS is the entity that has the power to sue.  In the *Mayberry* Action, however, KRS has outsourced its claims without exercising constitutionally required supervision, and without ensuring that the pursuit of its claims comply with applicable statutes.

9.     Through this action, BAAM and KKR respectfully ask this Court for a judgment that Defendants, in their capacities as Trustees of KRS, have failed to fulfill their constitutional duties—to exercise control over the claims that have been asserted on KRS's behalf—and for injunctive relief to preclude Defendants from continuing to violate BAAM's and

KKR's right to due process by permitting the continued use of contingency-fee counsel to pursue claims on behalf of KRS without KRS's supervision.

## THE PARTIES

10.     Plaintiff BAAM is a leading manager of institutional funds of hedge funds.  Its investment philosophy is to protect and grow investors' assets through both commingled and custom-designed investment strategies designed to deliver compelling risk-adjusted returns and mitigate risk.  Diversification, risk management, due diligence and a focus on downside protection are key tenets of BAAM's approach.  BAAM was the manager of the Clay Fund.

11.     Plaintiff KKR is a holding company whose operating subsidiaries constitute a leading global investment firm that manages multiple alternative asset classes, including private equity, energy, infrastructure, real estate and credit, with strategic partners that manage hedge funds.  During part of the period between 2012 and 2017, indirect subsidiaries of KKR owned Prisma.  KKR had no regular dealings with KRS.  KKR is not a member of the Boone Fund and has no contract with KRS.

12.     KRS is a component unit of the Commonwealth of Kentucky, created and organized under Kentucky Law pursuant to the 1956 Pension Law to manage and administer the pension plans established by the General Assembly for Kentucky citizens.  It is directed by a Board of Trustees established by statute to oversee, govern, and administer KRS and to provide guidance to KRS executive management and staff.

13.     Defendant David L. Harris is a Trustee of KRS.  Upon information and belief, he resides at 214 Forest Trail, Nicholasville, KY 40356–9150.  Defendant Harris was appointed to serve as a KRS Trustee in June 2016.

14.     Defendant Keith Peercy is a Trustee of KRS.  Upon information and belief, he resides at 962 Cobble Drive, Richmond, KY 40475–8317.  Defendant Peercy was elected to serve as a KRS Trustee in March 2015.

15.     Defendant W. Joe Brothers is a Trustee of KRS.  Upon information and belief, he resides at 115 Connecticut Court, Elizabethtown, KY 42701–2957.  Defendant Brothers was appointed to serve as a KRS Trustee in July 2017.

16.     Defendant John E. Chilton is a Trustee of KRS.  Upon information and belief, he resides at 1400 Willow Avenue Apt 1004, Louisville, KY, 40204–2516.  Defendant Chilton was appointed to serve as a KRS Trustee in June 2016.

17.     Defendant Raymond Campbell Connell is a Trustee of KRS.  Upon information and belief, he resides at 3081 Many Oaks Park, Lexington, KY 40509–8537.  Defendant Connell was elected to serve as a KRS Trustee in March 2018.

18.     Defendant Kelly Downard is a Trustee of KRS.  Upon information and belief, he resides at 2309 Merrick Road, Louisville, KY 40207–1254.  Defendant Downard was appointed to serve as a KRS Trustee in June 2017.

19.     Defendant John R. Farris is a Trustee of KRS.  Upon information and belief, he resides at 317 Hart Rd., Lexington, KY 40502.  Defendant Farris was appointed to serve as a KRS Trustee in June 2016.

20.     Defendant J.T. Fulkerson is a Trustee of KRS.  Upon information and belief, he resides at 1338 Hill Avenue, Owensboro, KY 42301–4512.  Defendant Fulkerson was appointed to serve as a KRS Trustee in 2013.

21.     Defendant David M. Gallagher is a Trustee of KRS.  Upon information and belief, he resides at 286 State Route 781 N., Fulton, KY 42041–7513.  Defendant Gallagher was appointed to serve as a KRS Trustee in August 2017.

22.     Defendant Sherry Lynn Kremer is a Trustee of KRS.  Upon information and belief, she resides at 3313 Frontier Trail, Louisville, KY 40220–2609.  Defendant Kremer was elected to serve as a KRS Trustee in March 2018.

23.     Defendant Matthew Monteiro is a Trustee of KRS.  Upon information and belief, he resides at 904 Thorpe Drive, Louisville, KY 40243–1950.  Defendant Monteiro was appointed to serve as a KRS Trustee in August 2017.

24.     Defendant Betty Pendergrass is a Trustee of KRS.  Upon information and belief, she resides at 2251 Stonewood Lane, Lexington, KY 40509.  Defendant Pendergrass was elected to serve as a KRS Trustee in March 2017.

25.     Defendant Jerry Wayne Powell is a Trustee of KRS.  Upon information and belief, he resides at 130 Sterling Drive, Georgetown, KY 40324–8200.  Defendant Powell was elected to serve as a KRS Trustee in March 2017.

26.     Defendant David Rich is a Trustee of KRS.  Upon information and belief, he resides at 4415 Brookhaven Avenue, Louisville, KY 40220–3618.  Defendant Rich was elected to serve as a KRS Trustee in November 2013.

27.     Defendant Thomas B. Stephens is a Trustee of KRS.  Upon information and belief, he resides at 116 Suburban Court, Lexington, KY 40503–1306.  Defendant Stephens was appointed to serve as a KRS Trustee in December 2015.

28.     In accordance with their responsibilities as Trustees, Defendants are required to manage the assets in KRS's investment portfolio, make investment decisions on behalf of KRS plans, and control the legal actions taken by KRS.

**JURISDICTION**

29.     This Court has jurisdiction over all of the Defendants because they are all Kentucky residents.

30.     Additionally, jurisdiction over each individual Defendant is proper because they are all currently serving as Trustees of KRS, a Kentucky state agency.

31.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because it arises under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

32.     Under 28 U.S.C. § 1391, venue is proper in this judicial district because a substantial part of the events or omissions giving rise to BAAM's and KKR's claims occurred in Franklin County, Kentucky.

**FACTUAL BACKGROUND**

I.     **The Creation of the Clay Fund**

33.     At the beginning of the year 2000, KRS was fully funded, meaning that it had the ability to pay its beneficiaries under its actuarial assumptions and estimates of investment performance.

34.     Beginning with the bursting of the "dot com" bubble that year, and through the financial crisis of 2008, KRS's investment portfolio suffered devastating losses. Indeed, during the financial crisis alone the fund lost over $4.4 billion, nearly 30% of its value. After suffering for a decade from its massive exposure to the volatility of the public equity markets, KRS—on the advice of its internal professional investment staff and a number of

9

outside consultants, including financial advisor R.V. Kuhns & Associates, Inc. ("RVK")—decided to reallocate a portion of its investments to create a more diversified overall investment portfolio.

35.     On August 12, 2010, RVK presented KRS's Investment Committee with several potential investment portfolios that proposed allocating KRS assets to different strategies. KRS's Investment Committee *unanimously* approved the proposed portfolio that allocated 10% to absolute return strategies designed to reduce risk, preserve—rather than generate—capital, and provide returns uncorrelated to the U.S. equities market.

36.     It was against that backdrop, and with substantial input from KRS's internal professional investment staff (KRS's "Investment Professionals") and its outside consultant RVK, that on August 19, 2010, KRS's Board of Trustees affirmed the Investment Committee's decision and approved a 10% allocation of KRS's investment portfolio to "absolute return" strategies.

37.     In May 2011, the KRS Board of Trustees met to review and approved a new Statement of Investment Policy, which established the "Absolute Return Program," subject to the "specific approval of the Investment Committee of the Board of Trustees."  The stated purpose of KRS's Absolute Return Program was to "creat[e] a diversified portfolio" and "to preserve capital and deliver positive (absolute) returns under most market conditions."

38.     As part of this strategy, KRS, in consultation with its Investment Professionals and outside consultant RVK, commenced an extensive formal search process for investment managers to run a fund of hedge funds portfolio.

39.     During the spring and summer of 2011, as KRS—with the assistance of its Investment Professionals and team of consultants, including RVK—began to narrow down the

list of candidates for its fund of hedge funds mandate, KRS pushed the remaining managers on their proposed fees, ultimately securing a significant discount from BAAM on its proposed management fees.

40.     After multiple rounds of conference calls and on-site meetings with a number of different managers, KRS—aided by its Investment Professionals and outside advisors—ultimately selected BAAM as one of three managers with which to invest, along with Prisma and Pacific Alternative Asset Management Company, LLC ("PAAMCO").  KRS's Investment Professionals concluded, with the advice of their external consultants, that these three managers provided the most value based on a "combination of a qualitative assessment of the investment processes employed and a quantitative assessment of the return streams that each firms' respective investment processes led to."

41.     BAAM and KRS then engaged in extensive discussions concerning the structure of the portfolio BAAM would manage on behalf of KRS.  The parties also vigorously negotiated the agreements governing KRS's investment.  KRS provided BAAM with specific return targets and proposed detailed investment guidelines that BAAM was required to follow. KRS also requested that their BAAM investment vehicle be named the "Henry Clay Fund" after the famous Kentucky historical figure.

42.     KRS was advised throughout the negotiation by Reinhart Boerner Van Deuren S.C. ("Reinhart"), whose stated mission is "to be the foremost advocate and single-stop provider for the legal needs of institutional investors worldwide."  KRS was actively involved in drafting the governing agreements, including proposing the form of LLC agreement that was used.

11

43.     After numerous drafts and negotiations, on August 29, 2011, KRS entered into a Limited Liability Company Agreement ("LLCA") with BAAM and Blackstone Alternative Asset Management Associates ("BAAMA") to govern the affairs of the Clay Fund and the respective rights and obligations of its members.  The investment guidelines and return targets that KRS and BAAM had agreed upon were incorporated into the LLCA.

44.     The LLCA attached as an annex KRS's investment guidelines (the "KRS Investment Guidelines") that set forth KRS's specific investment goals.  The KRS Investment Guidelines were drafted by KRS and made expressly clear that KRS intended the Clay Fund to serve as a conservative, diversified investment product that would protect against downside risk in the equity and fixed-income markets and reduce the volatility of KRS's overall portfolio.

45.     In addition, the LLCA attached as an annex KRS's own "Statement of Investment Policy" (the "KRS Investment Policy").  This was a KRS document that expressly set forth KRS's overall investment objectives, including its strategy of investing in conservative "fund-of-funds" products to establish a hedge against downside risk in the equity and fixed-income markets and to reduce the volatility of KRS's overall portfolio:

> The objective of the absolute return strategy is to preserve capital and deliver positive (absolute) returns under most market conditions.  It is anticipated that the returns from this program should largely be uncorrelated to market movements in both the equity and fixed income markets (systematic risk) and primarily be based on manager skill; therefore, helping to diversify the overall KRS portfolio. . . .  As such, the objective of the Absolute Return Program is designed to help reduce the volatility of the overall KRS portfolio while seeking to enhance returns in a variety of market environments.[2]

---

[2]     In July 2014, KRS and BAAM entered into an amended and restated LLCA, the terms of which were materially the same as those in the 2011 LLCA, and which contemplated no new investment.  KRS updated its Asset Allocation Guidelines to include the following statement with respect to absolute return strategies: "By focusing on the idiosyncratic risks of security selection and often attempting to minimize systematic market risks through hedging activities, absolute return managers can make investment decisions unconstrained by restrictive relative

46.     The KRS Investment Policy stated that KRS's fund of funds strategy was intended to produce a rate of return in excess of the HFRI Diversified FOF benchmark, which was 2.35% during the life of the Clay Fund investment.  The Clay Fund produced net returns of 6.5% per annum, thereby exceeding by nearly *three times* the benchmark return set by KRS.

47.     The LLCA plainly disclosed the terms of the investment, including BAAM's fees and the fees of the underlying managers, and expressly provided KRS with access to additional information from BAAM and the underlying managers of the Clay Fund.  For example, the LLCA expressly states that "[t]he asset-based fees of the Portfolio Managers generally are expected to range from 1% to 3%, and the performance-based allocations or fees of the Portfolio Managers generally are expected to range from 10% to 30%."  Those fee ranges were in line with the standard management and incentive fees charged to investors in funds of funds.  KRS warranted that it understood "the method of compensation" and "the nature of the fees paid to the Manager, BAAMA[,] and the portfolio managers" (Subscription Agreement § II(G)) and agreed "to ask questions of, and receive answers from" BAAM should it have any questions about the terms and conditions of the investment.

48.     TJ Carlson, then the Chief Investment Officer ("CIO") of KRS, signed the LLCA on August 29, 2011.

## II.     The Clay Fund's Performance Significantly Exceeded All of KRS's Benchmarks

49.     In 2016, KRS began to consolidate its fund of hedge funds investments with one investment manager and to shift its strategy towards investments directly in hedge

---

benchmarks such as the S&P 500 or Barclay's Aggregate Bond Index, and add value to portfolios by achieving favorable risk-adjusted returns in most market environments while also reducing overall plan volatility."

funds (rather than funds of funds).  In February 2016, the KRS Investment Committee voted to wind down the Clay Fund investment.

50.     By that time, the Clay Fund had provided KRS precisely the returns it had asked for, and more.  According to KRS's public website, through the end of June 2016, when BAAM began to return most of KRS's investment, the Clay Fund had generated annualized net returns of 6.5%.

51.     Over that same period, the annual return of KRS's stated target in the KRS Investment Guidelines of LIBOR plus 3% to 5% was 3.37% to 5.37%.  The annual return of KRS's benchmark rate of return in the KRS Investment Policy, the HFRI Diversified FOF, was 2.35%.  The Clay Fund thus significantly exceeded both the specific return target KRS chose to include in the LLCA and the benchmark by which KRS chose to measure the performance of its fund-of-funds investments.

52.     Over the life of KRS's investment, the Clay Fund returned over $158 million in profits to KRS, net of fees, of which KRS actively negotiated and secured a significant discount.  Those returns represented an increase of over 33% on the $465 million that KRS had put into the Clay Fund over the life of the investment.  KRS never expressed any concerns to BAAM regarding the nature or performance of its investment.

53.     Reports available on KRS's website compare the performance of all investment managers in KRS's portfolio to the stated benchmarks for those investments.  For the years for which information is currently available on KRS's website, 2013 to 2016, *BAAM was one of only six managers in KRS's entire investment portfolio that outperformed its stated benchmark in all four years*.

III.     <u>Facts Relating to KKR</u>

54.     KKR is a holding company.  KKR is not a signatory to the Boone Fund LLC agreement.  There is no contract between KKR and KRS.

55.     In October 2012 (more than a year *after* Prisma and KRS signed the Boone Fund LLC agreement), KKR's indirect subsidiaries acquired 100% of the equity interests of Prisma.  KKR's indirect subsidiaries held those interests until June 2017, at which time Prisma was combined with another *Mayberry* defendant, PAAMCO.  At that time, KKR's indirect subsidiaries transferred their equity interests in Prisma to another holding company, PAAMCO Prisma Holdings, LLC.  That other holding company operates its business separately from KKR.

56.     Between October 2012 and June 2017, KKR and Prisma each retained their own separate status as distinct legal entities.  Prisma executed contracts in its own legal name and maintained its own registration status with the SEC.

57.     Based on public filings by Prisma in the *Mayberry* litigation, KKR alleges the following facts in this paragraph on information and belief:  KRS and Prisma signed the Boone Fund's LLC agreement on August 23, 2011.  The Boone Fund continues to exist today.  Between its creation in August 2011 and the end of 2018, the Boone Fund produced profits for KRS in the amount of approximately *$139 million net of fees*.  This return exceeded the performance benchmarks set forth in the Boone Fund contractual agreements between KRS and Prisma.

## IV.     The *Mayberry* Action

58.     Since the losses it sustained in 2000 with the collapse of the dot-com bubble, KRS has developed significant unfunded pension liabilities.  The circumstances that created those liabilities have been widely studied.  According to nearly every public report and

study on the issue, including the 2017 PFM Consulting Report commissioned by KRS itself, the increase in KRS's liabilities is due to a complex set of factors, including years of incorrect actuarial assumptions and employer underfunding, unaccounted for demographic changes, and billions of dollars in investment losses occurring over two separate stock market crashes in 2000–01 and 2008–09.

59.     The *Mayberry* Plaintiffs, however, uniquely, seek to blame BAAM and KKR, among others, for this dilemma plainly not of BAAM's or KKR's making that preceded BAAM's investment mandate and KKR's purchase of Prisma by more than a decade.  The *Mayberry* Plaintiffs' private, contingency-fee counsel plainly seek to take advantage of KRS's underfunding and the attendant political turmoil by asserting these unprecedented and frivolous claims.

60.     They are represented by private, contingency-fee counsel from no fewer than five law firms, including the Oldfather Law Firm; Bahe Cook Cantley & Nefzger, PLC; Cuneo Gilbert & LaDuca, LLP; MCL Law Group, APC; and Scott Douglass & McConnico LLP.

61.     Upon information and belief, MCL Law Group, APC, is run by Michelle Ciccarelli Lerach, whose husband is William S. Lerach.  Mr. Lerach is a former attorney who, on October 29, 2007, pleaded guilty to a felony count resulting from his having paid illegal cash kickbacks to lead plaintiffs in previous actions.   The California Bar Association disbarred Mr. Lerach in 2009.

62.     Upon information and belief, Mr. Lerach formed Pension Forensics, LLC, a pension consultancy, shortly before the initiation of this lawsuit.   He is the only employee of Pension Forensics, LLC.

63.    The *Mayberry* Plaintiffs have retained Pension Forensics as a pension consultant.   Upon information and belief, Pension Forensics has no other clients and has consulted on no other lawsuits besides the *Mayberry* Action.

64.    KRS is a nominal defendant in the *Mayberry* Action.  It is represented by counsel separate from that representing the *Mayberry* Plaintiffs—namely, Stoll Keenon Ogden PLLC.

65.    The *Mayberry* Complaint asserts claims for breach of duty, conspiracy, and aiding and abetting against all 31 defendants.  The *Mayberry* Complaint alleges that these 31 defendants participated in a conspiracy to sell "completely unsuitable" fund-of-funds investments to KRS, supposedly knowing that they were too "risky" in light of KRS's financial condition. Ex. 1 ¶¶ 4, 103.  According to the *Mayberry* Plaintiffs, had KRS instead invested

> in a no/low-fee stock index fund like the S&P or DJIA, the [investment] would have turned into at least $3 billion over the next seven years.  If [KRS] had simply stayed with the existing 2009 asset allocations, the Funds would have enjoyed investment results that would have left it far better funded than they are now, an opportunity for gains and income that is now lost due to imprudent investments.

*Id.* ¶ 233.

66.    KRS's active negotiation and drafting of the Clay Fund's governing agreements belie the allegations in the *Mayberry* Action.  These allegations stand in stark contrast to KRS's own measurement of the performance of its investments, including the Clay Fund, against the stated benchmarks in its Investment Policy, incorporated into the parties' negotiated LLCA:

> The objective of the absolute return strategy is to preserve capital and deliver positive (absolute) returns under most market conditions.  **It is anticipated that the returns from this program should largely be uncorrelated to market movements in both**

17

> **the equity and fixed income markets (systematic risk) and
> primarily be based on manager skill; therefore, helping to
> diversify the overall KRS portfolio**. . . .  As such, the objective of
> the Absolute Return Program is designed to help reduce the
> volatility of the overall KRS portfolio while seeking to enhance
> returns in a variety of market environments.

In other words, KRS contracted with BAAM specifically to provide returns that were

*uncorrelated* to the U.S. equities market.

67.     The *Mayberry* Complaint further alleges that the Clay Fund, along with

KRS's other fund-of-funds investments, was a "Black Box," and that the Clay Fund's fees

"could not be calculated and were not disclosed to KRS."  Ex. 1 ¶¶ 102, 104.  The *Mayberry*

Plaintiffs assert these claims notwithstanding KRS's solicitation, with the assistance of outside

counsel and investment consultants, of investment terms from BAAM in 2010; its active

negotiation of BAAM's fee structure during the search process in 2011, through which KRS

ultimately secured a significant discount from BAAM on its proposed management fees; and its

selection of BAAM from among several fund managers—a decision approved by its Board of

Trustees.

68.     The *Mayberry* Complaint asserts breach of fiduciary duty claims against

BAAM, yet fails to allege a single action taken by BAAM contrary to its obligations in the Clay

Fund's governing agreements.  Rather, the *Mayberry* Plaintiffs' novel theory of breach of

fiduciary duty is that BAAM and other defendants sold KRS products that KRS requested, but

that the defendants should have refrained from selling to KRS, despite KRS's express

representations that the Clay Fund was a suitable investment.

69.     Even more far-fetched is the *Mayberry* Plaintiffs' claim that all 31

defendants participated in a single, entirely vague "conspiracy" to hide the allegedly "risky"

nature of the funds of funds from KRS, even though KRS specifically described funds of funds

as part of a conservative, capital-preserving absolute return strategy in its Statement of Investment Policy, and experienced, Investment Professionals—aided by experienced consultants—vetted each of the three funds of funds in which KRS ultimately invested.  Notably, the *Mayberry* Plaintiffs and their private, contingency-fee counsel freely admit that they filed the lawsuit without even having read the contracts between KRS and BAAM governing the Clay Fund, and to the extent those contracts contradict their allegations, the *Mayberry* Plaintiffs have argued against the validity of such contracts.

70.     The Complaint drafted by *Mayberry* Plaintiffs' private, contingency-fee counsel contains wholly irrelevant or misleading information, that plainly attempts to foster bias against the defendants.  To give just one example, the Complaint alleges that two individuals affiliated with BAAM, Stephen Schwarzman and J. Tomlison Hill, were "both top executives at Lehman Brothers, which was later implicated as having a significant role in one of the largest Wall Street frauds of all time, and directly causing the 2008-2009 financial meltdown with consequent loss of billions in individual and institutional equity and a torrent of litigation alleging fraud."  *Id.* ¶ 232.  The Complaint fails to mention that both Schwarzman and Hill left Lehman Brothers *decades* before these stated events.  There are numerous other similarly wildly irrelevant allegations cynically designed to inflame, and obscure the true facts.

71.     The *Mayberry* Plaintiffs seek a judgment that all 31 defendants purportedly are jointly and severally liable for damages representing what they call "the increased costs to the Commonwealth of restoring KRS and its Pension/Trust Funds to properly funded status."  *Id.* ¶ 285.  In other words, the *Mayberry* Plaintiffs—and their private contingency-fee counsel—are attempting to obtain from BAAM, KKR, and their co-defendants compensatory damages equivalent to the *entirety* of the funding shortfall that KRS faces, which,

19

according to the *Mayberry* Complaint, totals approximately *$50 billion*, plus an unspecified amount of punitive damages.

72.     The *Mayberry* Plaintiffs' request for damages is not tied to any losses suffered from KRS's investment with BAAM—nor could it be because there were no such losses.  The Clay Fund *significantly* outperformed every contractual benchmark that KRS set for it while generating over $158 million in profits for KRS, net of all fees.

73.     The *Mayberry* Plaintiffs therefore instead seek to hold BAAM liable for damages equivalent to the *entirety* of KRS's investment losses since 2000 (none of which were sustained in investments managed by BAAM).  This is preposterous, not only because its investment was profitable for KRS, but also because it is undisputed that hedge fund investments represented just 10% of KRS's investment portfolio.  Indeed, the BAAM investment comprised less than one-third of that 10% allocation—a miniscule percentage of KRS's total investment portfolio.  Moreover, BAAM did not even begin managing that tiny fraction of KRS's assets until 2011, some eleven years after the *Mayberry* Plaintiffs seek to hold BAAM responsible for damages.

74.     The *Mayberry* Plaintiffs also seek from BAAM, the other fund manager defendants, and KKR an unspecified amount of punitive damages intended to punish those defendants for conduct Plaintiffs allege was willful, reckless, malicious, and oppressive.  Specifically, the *Mayberry* Complaint alleges that "[t]he acts and omissions of [BAAM, its fund manager co-defendants, and KKR] constitute willful and wanton conduct, gross negligence, and/or malice and oppression, for which [the *Mayberry*] Plaintiffs are entitled to recover punitive damages due to the disregard for the rights of KRS, its Pension Funds, the Commonwealth, and Kentucky's taxpayers."  *Id.* ¶ 319.  And while they do not allege the precise amount of punitive

20

damages to be obtained from BAAM and KKR, the *Mayberry* Plaintiffs ask the Franklin Circuit Court to declare the Kentucky statutory cap on punitive damages unconstitutional and null and void, suggesting the *Mayberry* Plaintiffs will seek a highly excessive punitive damages award from BAAM and KKR.  *Id.* ¶¶ 320, 323.

75.     The damages sought from BAAM and KKR are therefore penal in nature and implicate the requirement of neutrality typically imposed on government attorneys in criminal and enforcement proceedings.  They represent punishment for what the *Mayberry* Plaintiffs allege was "grossly negligent, willful, reckless wanton conduct," *id.* ¶ 323, despite the fact that KRS engaged in an extensive search process, was assisted by Investment Professionals, outside counsel, and financial consultants, and warranted to BAAM that its investment in the Clay Fund was "suitable" to its diversification needs.  It can only be concluded that the *Mayberry* Plaintiffs seek to hold BAAM and KKR liable for Kentucky's $50 billion shortfall because of BAAM's and KKR's perceived deep pockets.

76.     The *Mayberry* Plaintiffs' demands for equitable relief compound the due process violation.  In their Prayer for Relief, the *Mayberry* Plaintiffs seek broad equitable relief, including the appointment of "a Special Fiduciary" to "oversee" a net recovery, use of the court's "equity power to fashion such relief as is justified and necessary to benefit KRS," and imposition of "such other legal and equitable relief as the court deems appropriate."  *Id.* at Prayer for Relief ¶ 8; *see also id.* ¶ 59, n.11 (requesting that any "recovery" be paid "under the supervision of this court" to "assure that all monies are applied properly").  The *Mayberry* Plaintiffs thus purport to invoke the state court's authority to award and monitor sweeping equitable relief for the benefit of KRS, but without any supervision by KRS itself, and in contravention of  the equitable

principle that the party seeking equity must come to court with clean hands.  Due process requires that KRS take responsibility for claims made purportedly in its name and for its benefit.

77.     The *Mayberry* Complaint acknowledges that "[w]hile KRS is designated a 'Defendant,' that designation is a technical formality, *i.e.*, it is a 'nominal defendant.'  In reality, KRS is the plaintiff in *the Mayberry* Action, which is on behalf of, not against, KRS and in order to obtain relief for it, not from it or from any other unit or part of the government of the Commonwealth of Kentucky."  *Id.* ¶ 60.  Elsewhere in the Complaint, the *Mayberry* Plaintiffs emphasize that they are not suing on their own behalf.  *See id.* ¶ 274 ("Plaintiffs seek no individual recovery for themselves or any individual taxpayer.").  Instead, they have asserted the action on behalf of KRS and seek a "[d]etermin[ation] and award[] to KRS and its Pension Funds and the Commonwealth of Kentucky the damages sustained by them as a result of the violations set forth" in the *Mayberry* Complaint.  *Id.* at Prayer for Relief ¶ 4.

78.     In February 2018, BAAM, KKR, and their co-defendants filed motions to dismiss the *Mayberry* Action on a variety of grounds, namely, that the claims were barred by the relevant statutes of limitations; lack of personal jurisdiction over certain defendants; failure to state a claim; and that *Mayberry* Plaintiffs lack statutory standing to assert claims on behalf of KRS.  In a subsequent motion, BAAM, KKR, and their co-defendants argued that the *Mayberry* Plaintiffs also lack constitutional standing to pursue claims on KRS's behalf, given Kentucky's recent adoption of Article III standing principles in *Commonwealth of Kentucky, Cabinet for Health & Family Services* v. *Sexton*, No. 2016-SC-00529-DG, slip op. (Ky. Sept. 27, 2018).

79.     Nevertheless, the Franklin Circuit Court entered an order denying the motions to dismiss.  In so doing, it incorrectly held that the *Mayberry* Plaintiffs have standing to

assert claims derivatively on behalf of KRS and on behalf of the Commonwealth of Kentucky in their capacity as taxpayers.

80.     In the wake of that decision, the *Mayberry* Plaintiffs have pushed for an expedited trial date and immediate, expansive discovery.  Now facing the burden and cost of that discovery, BAAM and KKR seek declaratory and injunctive relief from Defendants' outright violation of BAAM's and KKR's right to due process by failing to exercise control over the *Mayberry* litigation.

## V.     Due Process Requires Defendants to Exercise Control Over the *Mayberry* Litigation

81.     Due process requires that attorneys bringing claims on behalf of the government consider not only the interests of the government as their client, but also broader considerations of neutrality and justice.  *See Berger* v. *United States*, 295 U.S. 78, 88 (1935).

82.     Courts have implemented this policy of neutrality by imposing obligations on state governments to supervise private attorneys working for them on a contingency-fee basis in order to ensure that there are appropriate safeguards to protect the public interest.  *See, e.g.*, *Merck Sharp & Dohme Corp.* v. *Conway*, 947 F. Supp. 2d 733, 739 (E.D. Ky. 2013) (the employment of contingency-fee counsel would be a due process violation unless the Attorney General retained "full control over the course of the litigation.") (quoting *City & Cnty. of San Francisco* v. *Philip Morris, Inc.*, 957 F. Supp. 1130, 1135 (N.D. Cal. 1997)).

83.     As in *Merck*, BAAM and KKR have "a due process right to a neutral prosecution, free from any 'financial arrangement that would tempt the government attorney,' or his outside counsel, 'to tip the scale.'"  *Id.* (quoting *People ex rel. Clancy* v. *Superior Court of Riverside Cty.*, 705 P.2d 347, 352 (Cal. 1985)).  When a contingency-fee lawyer prosecutes a case on behalf of the state without adequate oversight by the state agency, the process ceases to

be fair because the lawyer's natural financial incentive to seek to maximize damages threatens to override the state's obligation to see that justice is pursued.  This right to due process is critical in significant and costly disputes, such as this one, where the state forum might favor, or be perceived to favor, home state litigants like the *Mayberry* Plaintiffs.

84.     The contingency-fee basis on which the *Mayberry* Plaintiffs' counsel is being retained gives that counsel a substantial direct financial stake in the outcome of the *Mayberry* Action, despite the fact that they are pursuing claims derivatively on behalf of KRS and seeking financial recovery only for KRS's benefit.  Thus, the prosecutorial decision-making about the direction and strategy of litigation for KRS's benefit is being driven by the profit motivations of private, contingency-fee counsel.  Use of such counsel, without proper safeguards, not only gives the appearance of impropriety and undermines the public confidence in our legal system, but it constitutes a complete violation of BAAM's and KKR's right to due process.  The contingency-fee arrangement of the *Mayberry* litigation raises serious public policy issues that can only be addressed by KRS asserting absolute control and ultimate authority over the prosecution of its claims.

## VI.     KRS Neglects its Constitutional Obligation to Supervise Claims Brought on its Behalf, While Hoping to Profit from the Outcome

85.     When the *Mayberry* Complaint was filed, KRS was named as a nominal defendant.  However, the *Mayberry* Complaint clarifies that this "designation is a technical formality [because] [i]n reality, KRS is the plaintiff in th[e] action." Ex. 1 ¶ 60.  Yet the limited visibility into the nature of the relationships among KRS, other agencies of Kentucky government, and the *Mayberry* Plaintiffs' contingency-fee counsel suggests no supervision is being exercised by the real party in interest.  The little information that BAAM and KKR have

deduced has come from opaque filings in the *Mayberry* Action or from an Open Records request that KRS and the *Mayberry* Plaintiffs' counsel have bitterly opposed.

86.     When the *Mayberry* Complaint was first filed, KRS took no position on the action, which was ostensibly filed "derivatively" on KRS's behalf.  Then, on March 27, 2018—after BAAM and KKR filed their motions to dismiss the *Mayberry* Action but before a decision was rendered—the KRS Board of Trustees secretly met with a number of lawyers from firms representing the *Mayberry* Plaintiffs, Bill Lerach, and certain lawyers from the Office of General Counsel of the Governor.  BAAM and KKR only learned about this meeting as a result of an Open Records request filed by their co-defendants in the *Mayberry* Action, with which KRS has refused to fully comply.  Although the Kentucky Attorney General concluded that KRS is obligated to produce records of the March 27, 2018 meeting, all then-present members have resisted.[3]

87.     Indeed, KRS has argued that it may properly withhold documents relating to the meeting on the basis of a "common interest in the lawsuit" developed through communications with *Mayberry* Plaintiffs' counsel.  Even more curiously, KRS has argued that the presence of the Governor's attorneys did not waive the privilege because the Governor himself had authorized his staff to "provide legal representation" to KRS "in connection with *Mayberry*."

88.     Although it remains shrouded in secrecy, it appears that KRS's relationship with the *Mayberry* Plaintiffs evolved, culminating in the April 19, 2018 filing of

---

[3]   On April 15, 2019, the Franklin Circuit Court, ruling on cross-motions for summary judgment, held that under the Kentucky Open Records Act, KRS was entitled to withhold these records from the public pursuant to the attorney work product doctrine.  *See Ky. Ret. Sys.* v. *Morgan*, No. 18-CI-01243 (Franklin Cir. Ct. Div. II, Apr. 15, 2019).

"Plaintiffs' And Kentucky Retirement Systems' Joint Notice To The Court And Parties" (the

"Joint Notice") in the *Mayberry* Action.  *See* Ex. 2.  According to KRS, the Joint Notice was

created "[t]o formally announce [its] preliminary decision" to "align with the *Mayberry*

Plaintiffs."  The Joint Notice demonstrates that, notwithstanding its designation as a nominal

defendant, KRS has endorsed the litigation and will benefit directly by any damages award in

that action—but eschewed any responsibility for it.

89.     According to the Joint Notice, KRS

> established an independent special litigation committee of [its] Board of
> Trustees to investigate and consider the claims asserted in [*Mayberry*]
> Plaintiffs' Amended Complaint, and determine what role KRS should take
> in [the *Mayberry*] litigation, including whether KRS should directly assert
> the claims advanced in the Amended Complaint.

*Id.* at 1.

90.     The KRS special litigation committee determined that "it is in the best

interests of KRS for [*Mayberry*] Plaintiffs to continue their pursuit of these claims on a

derivative basis on KRS's behalf."  *Id.* at 1–2.  According to KRS,

> the derivative claims made by [*Mayberry*] Plaintiffs appear to have merit
> and should proceed to discovery under the civil rules.  The amount in
> controversy in the Amended Complaint [$50 billion] is substantial and, if
> recovered, could have a significant impact on the financial well-being of
> KRS and its member employees and retirees.

*Id.* at 2.

91.     The Joint Notice further states that, "[i]n the derivative format, [*Mayberry*]

Plaintiffs and their counsel will bear the primary risk of litigation costs and time necessary to

pursue these claims without undue expense to KRS, while providing a substantial potential

recovery that would directly benefit KRS."  *Id.* at 3.  "Based on KRS's observations and the

investigation of the independent special litigation committee, KRS believes that [*Mayberry*]

26

Plaintiffs are appropriate and adequate representatives for KRS and they are qualified to prosecute the derivative claims . . . on behalf of KRS through their counsel of record." *Id.* Whatever these "observations" or "investigations" may have been, they certainly do not constitute adequate safeguards to ensure the constitutionally required public accountability of public agencies.

92.     Tacitly acknowledging that it has elected to stay on the sidelines, KRS asserted that it "reserves the right to seek realignment as plaintiff [in the *Mayberry* Action] if KRS subsequently determines that doing so is in the best interests of KRS, in the event a court determines that [*Mayberry*] Plaintiffs lack standing to pursue these claims or dismisses the claims on a ground that is unique to the [*Mayberry*] Plaintiffs' status that would not bar KRS from continuing to maintain some or all of the claims made in this action." *Id.* at 5.

93.     KRS, however, makes clear that it will not prosecute the case itself.  KRS stated that it "has determined that [it] will not pursue the claims asserted by [the *Mayberry*] Plaintiffs" and would not have done so had those claims been presented to it before the filing of the Complaint.  *Id.* at 1.

94.     KRS itself suggests it *cannot* pursue the claims.  The Joint Notice explained that, although KRS felt that the claims "appear to have merit and should proceed to discovery under the civil rules," it would not be pursuing them itself because the litigation would be "very expensive and time consuming." *Id.* at 2.  "The nature of the [*Mayberry*] claims . . . is not typical of litigation a corporate board or state agency could easily authorize at this stage or pursue." *Id.*  Instead, Defendants would allow *Mayberry* Plaintiffs "to pursue these claims without undue expense to KRS, while providing a substantial potential recovery that would directly benefit KRS." *Id.* at 3.

95.     KRS's true reasons almost certainly include its realization that it would be impossible for it to succeed on its claims, particularly ones invoking the principles of equity, if it could not hide its own deliberate conduct behind the individual *Mayberry* Plaintiffs.

96.     Importantly, KRS did not state that it has retained *any* authority to direct or even oversee the pursuit of the *Mayberry* Action.  To the contrary, upon information and belief, it has ceded absolute control to the *Mayberry* Plaintiffs' private, contingency-fee counsel in direct violation of BAAM's and KKR's due process right to a neutral prosecution of claims belonging to a state entity.

97.     Serious public policy issues are raised when, as here, a state entity allows its claims to be prosecuted by contingency-fee counsel without adequate safeguards to ensure a fair and neutral prosecution.  "Our [legal] system relies for its validity on the confidence of society; without a belief by the people that the system is just and impartial, the concept of the rule of law cannot survive."  *Clancy*, 705 P.2d at 351.  When the claims of a state are pursued by attorneys that have a personal interest in the litigation, the neutrality that is so essential to the system is threatened; this arrangement poses a substantial risk that outside counsel will inflate the amounts sought in lawsuits in order to maximize their own potential stake in the litigation. This potential for unfairness and abuse rises to a constitutional violation where, as here, KRS appears to have ceded absolute control over the *Mayberry* litigation, including equitable remedies, to contingency-fee counsel.  *See Merck*, 947 F. Supp. 2d at 740 ("the Attorney General's discretionary decision-making must not be delegated to the control of outside counsel; rather, it is the outside counsel who must serve in a subordinate role") (quoting *State* v. *Lead Indus. Ass'n, Inc.*, 951 A.2d 428, 476 (R.I. 2008)).

28

98.     Here, contingency-fee counsel have a direct and substantial financial stake in the outcome of the *Mayberry* Action.  This profit motivation is subject to abuse without KRS's engagement and oversight; BAAM and KKR are being forced to defend themselves against a biased prosecution in which $50 billion—plus an unspecified amount of punitive damages that potentially will exceed the statutory maximum amount of punitive damages permitted under Kentucky law—are sought in quasi-criminal or enforcement proceedings.  This is so despite the fact that the Clay Fund significantly exceeded KRS's specific return target, returning over *$158 million in profits* to KRS, *net of fees*, and the Boone Fund met or exceeded KRS's stated benchmarks by returning more than *$139 million in profits* to KRS.  Moreover, as KRS freely admitted, it would not have asserted this case on its own.  *See* Ex. 2 at 1 ("KRS has determined that [it] will not pursue the claims asserted by [the *Mayberry*] Plaintiffs" and would not have done so had those claims been presented to it before the filing of the *Mayberry* Complaint).

99.     KRS has acknowledged to the Supreme Court of Kentucky that its interest in the *Mayberry* Action is a matter of great public importance:  "KRS would benefit financially from any recovery obtained by [the *Mayberry* Plaintiffs and is] financially affected by any delay in this matter. . . . [T]he more time it takes to resolve [certain issues at stake in the *Mayberry* Action], the larger the burden becomes on KRS's already troubled financial situation."  This is so, says KRS, because the *Mayberry* Plaintiffs "have advanced claims . . . and are seeking damages in the billions of dollars which, if awarded, would be recovered by KRS."

100.    Taken together, these statements make clear that Defendants, as Trustees of KRS, have abdicated their constitutional duty to control contingency-fee counsel's pursuit of a

29

litigation through which KRS stands to reap significant financial gain and impose significant and punitive penalties on BAAM and KKR.

101.    KRS's counsel in the *Mayberry* Action—members of the law firm Stoll Keenon Ogden PLLC—have made representations in open court in the *Mayberry* Action demonstrating Defendants' unacceptably arm's-length relationship to the prosecution of the *Mayberry* claims.  For instance, KRS's counsel has sought to reassure the *Mayberry* Court that KRS is ultimately accountable for the Plaintiffs' enforcement of KRS's claims.  But that justification is entirely vague and raises more questions as it answers:  "I just listened to statements that there is concern about oversight and accountability of the plaintiffs because KRS wouldn't have a voice in this.  At the risk of taking on a greater role than I ever want in life, I guess I'm that voice because KRS does have counsel, and they are here."  Beyond assuring the *Mayberry* Court that "they are here," however, KRS's counsel has not articulated how, if at all, it is involved in the oversight and direction of the pursuit of its claims.

102.    Upon information and belief, KRS and the *Mayberry* Plaintiffs have not entered into any contractual arrangement that would allow KRS to control the *Mayberry* Plaintiffs' actions in the litigation, nor has KRS established any safeguards on contingency-fee counsel's behavior.

103.    KRS has participated in the *Mayberry* Action only to express its sideline support for the *Mayberry* Plaintiffs' requested financial relief for KRS.  It has not responded to any dispositive motion.  Indeed, although a Defendant, it has not even filed an answer to the *Mayberry* Plaintiffs' Amended Complaint.

**VII.    Absent KRS's Constitutionally Mandated Supervision, the *Mayberry* Plaintiffs' Contingency-Fee Counsel Have Litigated Without Respect for Principles of Neutrality**

30

104.    Throughout the course of the litigation, the *Mayberry* Plaintiffs' contingency-fee counsel have adopted a scorched-earth litigation strategy, ignoring procedural rules and in a manner that is totally inconsistent with the constitutionally mandated requirement of neutral prosecution.

105.    Indeed, while purportedly standing in the shoes of KRS, the *Mayberry* Plaintiffs have engaged in conduct that KRS itself has recognized as inappropriate and damaging to its contractual relationships in other litigations.  It is inconceivable that KRS could be exercising control over the *Mayberry* Plaintiffs' counsel when that counsel has taken positions antithetical to KRS's own interests, and positions KRS has taken in other matters.

106.    To give just one example, the *Mayberry* Plaintiffs filed a so-called "Motion for Open Proceedings" in the *Mayberry* Action.  In that motion, the *Mayberry* Plaintiffs requested that the Court order that "no document should be filed under seal or with restricted access [or] be stamped as 'confidential.'"  Through this motion, *Mayberry* Plaintiffs sought, and continue to seek, to publicize materials obtained through discovery for non-litigation purposes. And KRS has represented to the Court that it supports Plaintiffs' request for open proceedings, even though it is well aware that such a request violates its own contractual confidentiality provisions.

107.    But KRS's own contracts with BAAM reflect the importance of these confidentiality provisions.  In Section 7.4(b) of the LLCA of the Clay Fund, KRS agreed to protect confidential information according to highly specific terms and exceptions.  The *Mayberry* Plaintiffs are actively seeking to breach contractual obligations to which KRS agreed.

108.    And even in the *Mayberry* case, KRS has sought to protect its confidential information.  For instance, preceding certain productions in discovery, KRS wrote to the parties

31

stating that "KRS has just been made aware that certain Defendants . . . intend to produce materials that are the property of KRS in response to [*Mayberry*] Plaintiffs' discovery requests. . . . No Defendant has authorization from KRS to produce any document containing confidential or trade secret information. . . ."  KRS has thus been entirely inconsistent on its position with regard to confidentiality.  As a nominal defendant in the *Mayberry* case, KRS apparently supports the *Mayberry* allegations that, for example, BAAM and the other fund managers did not disclose their fee arrangements, underlying fund investments, and other information.  Yet, as a signatory to the contractual agreements with those fund managers, KRS is indisputably aware that such information *was* in fact provided to it in full satisfaction of the parties' contractual obligations.  KRS, therefore, must know that the allegations asserted on its behalf in the *Mayberry* litigation are baseless.

109.    When BAAM sought assurances from *Mayberry* Plaintiffs' counsel that they "not disclose any of the documents [containing confidential KRS information] until the Court hears the motion [for a protective order]," *Mayberry* Plaintiffs' counsel "reject[ed] the request.  We acknowledge no obligation to honor this request, nor have we ever done anything to give any defendant the slightest reason to think that we would.  To the contrary, we have made our commitment to transparency well known since the inception of this litigation.  We assume that all document productions were made with full knowledge of that commitment, and of our corresponding intent that the public be as fully informed of what is learned during the course of this litigation as it chooses to be."  KRS's *ad hoc* emails to BAAM, KKR, and other co-defendants demonstrate that KRS is clearly at odds with *Mayberry* Plaintiffs' counsel's confidentiality strategy, further evincing KRS's lack of control over the *Mayberry* litigation.

110.    Among the information that the *Mayberry* Plaintiffs seek to have produced without the protections of confidentiality are the management fees charged by the underlying funds in which the Clay Fund invested.  But as the *Mayberry* Plaintiffs are well aware, these fees are subject to pre-negotiated confidentiality agreements with third-parties, and both BAAM and KRS are contractually obligated to keep those documents confidential.

111.    The *Mayberry* Plaintiffs' blatant disregard for KRS's contractual obligation to protect the confidential information of third parties will place a chill on service providers' willingness to contract with KRS in the future.  Indeed, it already has.  In June 2018, the hedge fund Davidson Kempner terminated its relationship with KRS, and returned KRS's $68.7 million investment, because of the *Mayberry* lawsuit generally, and specifically because of the threat that the *Mayberry* Plaintiffs' demand for transparency poses to its business relationships with third parties.

112.    When litigating claims on its own behalf in other actions, KRS has recognized this important confidentiality obligation to its contractual partners.  In its July 2014 motion to dismiss in *City of Fort Wright* v. *Board of Trustees of Kentucky Retirement Systems* (Kenton Cir. Ct. Div. III, No. 14-CI-1085, *subsequently docketed as* Franklin Cir. Ct. Div. II, No. 14-CI-1259), KRS argued that "management fees are exempt from disclosure."  It further explained that "[t]he fee agreements are heavily negotiated and release of this information would provide an unfair commercial advantage to both the competitors of the investment manager and other investors competing in the investment arena with [KRS]."

113.    Despite having taken this principled and appropriate position when litigating on its own behalf, KRS's inaction and lack of participation in the *Mayberry* Action has

led to the derailment of the litigation, with contingency-fee counsel pursuing a scorched-earth litigation strategy that is at odds with KRS's interests and standard practice of litigation.

114.     By acting without the scrutiny and oversight of KRS, the *Mayberry* Plaintiffs are in fact creating legal exposure for KRS. On August 30, 2011, KRS entered into a subscription agreement to purchase membership interests in the Clay Fund. In Section IV(A) of the Subscription Agreement, KRS expressly agreed to reimburse BAAM against any losses or claims arising out of any material breach of the Subscription Agreement by KRS.

115.     Because the *Mayberry* Plaintiffs stand in KRS's shoes, and because the allegations in *Mayberry* Action stand in direct contradiction to KRS's representations and warranties (including that the investment was suitable, that KRS understood the investment, and that the fees were disclosed, among many others), any judgment in the *Mayberry* litigation will in fact be reimbursable by KRS—as will BAAM's costs of defense. To pursue these contractual rights, BAAM has been required to initiate litigation in the Delaware Court of Chancery. As such, even when BAAM secures the dismissal of the *Mayberry* claims, as it ultimately expects to do, the *Mayberry* Plaintiffs nevertheless have caused KRS significant costs due to its reimbursement obligations.

116.     In sum, KRS's lack of control over the *Mayberry* Action serves as an effective illustration of the importance of the constitutional requirement that government entities must supervise and control contingency-fee counsel acting on their behalf. The *Mayberry* Plaintiffs have taken actions of which KRS has disapproved in other litigation, stand contrary to KRS's contracts, and create exposure for KRS—and yet KRS has failed to intervene or otherwise assert control. Instead, it has allowed the *Mayberry* Plaintiffs to commandeer the litigation, while hoping to collect a windfall.

34

## COUNT I

### Declaratory and Injunctive Relief Against Defendants' Violation of BAAM's and KKR's Right to Due Process

117. Plaintiffs repeat and reallege paragraphs 1 through 116 as if fully set forth herein.

118. Courts have recognized that the constitutional guarantee of due process protects against claims brought by a state that are "motivated by improper factors." *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 249 (1980).

119. Accordingly, the existence of "a personal interest, financial or otherwise, into the enforcement process may . . . raise serious constitutional questions." *Id.* at 249–50.

120. *Mayberry* Plaintiffs' contingency-fee counsel have a direct and substantial financial stake in the outcome of the *Mayberry* Action. This profit motivation—without the safeguards of KRS's oversight and control—is subject to abuse, and deprives BAAM and KKR of their due process right to a neutral prosecution.

121. A penal civil action implicates this principle of neutrality, requiring the state agency to provide safeguard and supervision when relying on contingency-fee counsel to prosecute its claims. *See Merck*, 947 F. Supp. 2d at 739.

122. The action brought by the *Mayberry* Plaintiffs and approved of by KRS is penal in nature, both in that it seeks sweeping equitable relief that requires KRS's supervision and an amount of compensatory damages—$50 billion—that is in no way based on any loss suffered by KRS in relation to its investment in the Clay Fund or based on any other justifiable conduct alleged by BAAM and KKR, and in seeking an unspecified amount of punitive damages above and beyond the statutory limit on such damages.

35

123.    Defendants have encouraged and acquiesced to the *Mayberry* Plaintiffs through an undisclosed arrangement by which they have no ability to control or supervise the prosecution of an action prosecuted on KRS's behalf, and solely for KRS's benefit. The *Mayberry* Plaintiffs have so far litigated in a manner that demonstrates no control by any reasoned, neutral judgment from Defendants. To the contrary, the *Mayberry* Plaintiffs' conduct displays profit-making motivation above all other considerations. Contingency-fee counsel have stated in open court that the *Mayberry* Action is a "bellwether" case, suggesting they will seek a private campaign to profit from claims purportedly asserted on behalf of other public pension plans.

124.    In allowing contingency-fee counsel to hijack the prosecution of the *Mayberry* Action for their own profit and proceed under color of State law, Defendants have violated BAAM's and KKR's right to due process.

125.    BAAM and KKR therefore seek a declaratory judgment and injunctive relief from Defendants' due process violation of allowing the *Mayberry* Action to be litigated by unsupervised contingency-fee counsel.

126.    This ongoing violation of BAAM's and KKR's right to due process under the Fourteenth Amendment has caused actual and irreparable harm and will continue to cause such harm until this Court grants the relief to which BAAM is constitutionally required.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs hereby demand judgment as follows:

(a)    an Order for declaratory relief declaring that the Defendants, in their official capacities as Trustees of KRS and acting under color of State law, have violated BAAM's and KKR's right to due process under the Fourteenth Amendment by allowing private

36

lawyers with a financial stake in the action to pursue its claims without retaining any control or imposing any safeguards;

(b)     an Order enjoining or otherwise restraining Defendants from violating BAAM's and KKR's right to due process under the Fourteenth Amendment through an injunction preventing the continued use of contingency-fee counsel litigating on behalf of KRS who are not under the control and supervision of KRS;

(c)     an Order awarding BAAM and KKR reasonable costs and attorneys' fees in accordance with 42 U.S.C. § 1988;

(d)     any further relief that the Court deems just and proper.

Respectfully submitted,

WYATT, TARRANT & COMBS, LLP

By:  /s/ Donald J. Kelly
        Donald J. Kelly
        Virginia H. Snell
        Jordan M. White
        WYATT, TARRANT & COMBS, LLP
        500 West Jefferson Street, Suite 2800
        Louisville, Kentucky 40202-2898
        dkelly@wyattfirm.com
        vsnell@wyattfirm.com
        jwhite@wyattfirm.com

        – and –

PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP

        Brad S. Karp (*pro hac vice* to be submitted)
        Lorin L. Reisner (*pro hac vice* to be submitted)
        Andrew J. Ehrlich (*pro hac vice* to be submitted)
        Brette Tannenbaum (*pro hac vice* to be submitted)
        PAUL, WEISS, RIFKIND,
        WHARTON & GARRISON LLP
        1285 Avenue of the Americas
        New York, New York 10019-6064
        bkarp@paulweiss.com
        lreisner@paulweiss.com
        aehrlich@paulweiss.com
        btannenbaum@paulweiss.com

        *Counsel for Plaintiff Blackstone Alternative Asset
        Management L.P.*

DINSMORE & SHOHL LLP

By:  /s/ Barbara B. Edelman
        Barbara B. Edelman
        Grahmn N. Morgan
        John M. Spires
        Dinsmore & Shohl LLP
        250 W. Main Street, Suite 1400
        Lexington, KY 40507
        barbara.edelman@dinsmore.com

38

grahmn.morgan@dinsmore.com
john.spires@dinsmore.com

– and –

SUSMAN GODFREY L.L.P.

Barry Barnett (*pro hac vice* to be submitted)
Abigail Noebels (*pro hac vice* to be submitted)
Ryan Weiss (*pro hac vice* to be submitted)
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002
bbarnett@susmangodfrey.com
anoebels@susmangodfrey.com
rweiss@susmangodfrey.com

Steven Shepard (*pro hac vice* to be submitted)
SUSMAN GODFREY L.L.P
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
sshepard@susmangodfrey.com

*Counsel for Plaintiff KKR & Co. Inc.*

Dated:  April 18, 2019